**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NIGERIANS IN DIASPORA
ORGANIZATION AMERICAS,

      *Plaintiff*,

  v.

PATIENCE NDIDI KEY,

      *Defendant*.

Civil Action No. 19-3015 (RDM)

---

**MEMORANDUM OPINION AND ORDER**

    Pending before the Court is Plaintiff Nigerians in Diaspora Organization Americas'

("NIDOA") motion for a preliminary injunction. Dkt. 39. NIDOA is a continental nonprofit

organization that advocates for the interests of Nigerians in the Western Hemisphere. *See* Dkt.

51-10 at 9 (Bylaw §§ 1.02, 1.04). NIDOA operates using a hierarchical structure: the continental

Board of Trustees oversees national Boards of Directors, which in turn oversee local chapters.

*See id.* at 16–24 (Bylaw §§ 3.01–3.05). This lawsuit concerns control of the Board of Directors

of NIDOA's subsidiary organization in the United States. Plaintiff alleges that, under the

continental organization's bylaws, Defendant Patience Ndidi Key's term in office as the

chairperson of the Board of Directors of NIDOA-USA expired in 2019, at which time a new

Board elected that year should have taken office. But Key and her associates refused to cede

control of the Board to the newly elected officers, and thus, since September 2019, there have

been two separate groups claiming to be the Board of Directors of NIDOA-USA. Although

some of Plaintiff's claims seem to allege fraud or contract violations under state law, Plaintiff

filed suit in federal court on the theory that Key, by continuing to act in the name of NIDOA-

USA past the expiration of her term in office and otherwise without authority, is infringing the trademarks that protect Plaintiff's name and logo.

While the dispute between the dueling Boards continues, Key has now relinquished her position on the holdover Board of Directors and has thus ceased the activities that arguably infringed the trademarks. She argues, accordingly, that Plaintiff's motion for a preliminary injunction against her is moot. The Court agrees and, for similar reasons, also concludes that Plaintiff has not shown a likelihood of future irreparable injury attributable to Key.

The Court will, therefore, **DENY** the motion.

## I.  BACKGROUND

### A.    Findings of Fact

The Court makes the following findings of fact based on the testimony and exhibits presented at a four-day preliminary injunction hearing. *See* Minute Entry (Oct. 15, 2020); Minute Entry (Oct. 27, 2020); Minute Entry (Nov. 12, 2020); Minute Entry (Nov. 13, 2020).

1.     *Structure of NIDOA*

NIDOA is a nonprofit organization whose mission is "to promote the spirit of patriotism, networking and cooperation among Nigerians in the Diaspora, *for their individual and collective success in the countries of the Americas where they reside*, and to mobilize the vast resources of manpower and machinery toward building a greater Nigeria." Dkt. 51-10 at 10 (Bylaw § 1.04). Established in 2000 and registered in Washington, D.C., NIDOA presents various programming and events in support of that mission. *Id.* at 9 (Bylaw § 1.02); Dkt. 1 at 2, 4 (Compl. ¶¶ 3, 10–13). The organization operates throughout the Western Hemisphere, using a tiered structure. The parent continental organization, through its Board of Trustees, oversees the nation-level organizations and their Boards of Directors, which in turn have oversight over local chapters.

Dkt. 51-10 at 16–24 (Bylaw §§ 3.01–3.05); Dkt. 64 at 126 (Essien).  At present, only the United States has a national Board of Directors, which represents the interests of at least fourteen domestic chapters; Canada and Brazil each have one chapter (but no Board of Directors) as well. Dkt 1 at 4 (Compl. ¶ 12); Dkt. 65 at 68–69 (Eleonu); Dkt. 67 at 16 (Key).

A set of bylaws passed in 2013 and amended in 2015 govern the activities of NIDOA.[1] Dkt. 51-10 at 9 (Bylaw § 1.00).  Several provisions are relevant to the trademark dispute in this case.  Most directly, the bylaws provide that the name "NIDO Americas" and the organization's logo "inheres to the Organization for copyright and trademark purposes," as a result of "the pre-eminence of the use of the name 'NIDO Americas, Inc.' by this Organization since its inception." *Id.* (Bylaw § 1.02).  NIDOA accordingly "reserves its right to prosecute anyone who infringes upon its rights regarding copyright and mark of its name, mark and logo." *Id.*  And the name and logo "shall not belong to any other organization, entity, association and/or any individual member, past, present or in the future." *Id.*  To protect its marks, NIDOA has registered four trademarks with the United States Patent and Trademark Office.  Dkt. 51-6 (Ex. P-3); Dkt. 51-7 (Ex. P-4); Dkt. 51-8 (Ex. P-5); Dkt. 51-9 (Ex. P-6).  NIDOA's legal adviser, Michael Essien, testified that the trademarks belong to the continental organization and are therefore controlled by the Board of Trustees—and cannot be used by others without its consent. Dkt. 64 at 46 (Essien).

---

[1]  At the preliminary injunction hearing, Key's counsel questioned the validity of the 2015 amendments to the bylaws.  *See, e.g.*, Dkt. 65 at 20–26 (Essien); *id.* at 40–42 (George).  Key appeared to drop this argument in her briefing after the hearing, *see* Dkt. 69 at 4–5, and instead relied on the amended bylaws in support of her argument, *id.* at 7.  In any event, the Court's reliance on the amended version of the bylaws in summarizing the facts of the case does not bear on the Court's holding, and the Court expresses no view at this juncture on the validity of those amendments.

The next provision of the bylaws explains the naming conventions for country boards and local chapters.  The name "NIDO Americas" encompasses "the entire NIDO family in the Americas hemisphere."  Dkt. 51-10 at 9 (Bylaw § 1.03).  Each national board forms its name by adding the name of the country as a suffix, like "NIDO Americas – USA" or "NIDO Americas – Canada."  *Id.*  Individual chapters, in turn, received additional suffixes, as in these examples: "NIDO Americas – USA, Washington, DC Chapter" or "NIDO Americas – Canada, Toronto Chapter."  *Id.* at 9–10 (Bylaw § 1.03).

The bylaws also delineate the authorities of the continental Board of Trustees and the national Boards of Directors.  The "highest organ" of NIDOA is the "General Assembly" of its membership, which meets to make decisions for the organization at Annual General Meetings ("AGMs").  *Id.* at 16–17 (Bylaw § 3.02).  The General Assembly ratifies major actions of the Board of Trustees, like amendments to the bylaws and the annual budget.  *Id.*  For instance, amendments of the bylaws are effective only if ratified by a two-third majority of the General Assembly, voting at a General Meeting.  *Id.* at 35, 41 (Bylaw §§ 6.04, 9.02).

The Board of Trustees, which is the "highest governing body" of NIDOA, wields wide-ranging power.  *Id.* at 17 (Bylaw § 3.03).  The Trustees can, *inter alia*, sue and be sued in the name of the organization, make and amend the bylaws (with the General Assembly's approval), raise and spend money, buy and sell property, establish conditions for membership, and "do all things necessary or convenient, not inconsistent with the law of the District of Columbia or any other Nations, States or Provinces in the Americas, to further the activities and affairs of the Organization."  *Id.* at 11–12 (Bylaw § 2.03.1).  The Board of Trustees also has oversight of subsidiary entities.  "The Board of Trustees may give policy or operational directives to the National NIDO Americas organizations on all matters with respect to which the National NIDO

Americas has power to act under the NIDO Americas Bylaw." *Id.* at 17 (Bylaw § 3.03).  Even more broadly, the Trustees serve as "the primary guarantor of the sanctity of the Bylaws, policies and procedures, as well as the integrity of the Organization, and shall have oversight responsibility over all organs, committees and members of the Organization to ensure that the Bylaws, policies and procedures are complied with by the membership." *Id.* at 18 (Bylaw § 3.03).  Finally, the Board of Trustees is responsible for certifying the membership of the national Boards of Directors each year. *Id.*

The national Boards of Directors, in turn, are the "highest governing body of the Organization at each country level," *id.* at 20 (Bylaw § 3.05.1), and "shall have powers similar to the Continental Board of Trustees, but their jurisdictional powers shall be limited to their respective nation states," *id.* at 13 (Bylaw § 2.03.2).  That is, "[e]ach National Board[] of Directors shall have the responsibility of establishing the parameters for the operation of NIDO Americas in the country where it is located." *Id.* at 20 (Bylaw § 3.05).  The Boards of Directors have responsibility for setting policies and objectives at the national level and for overseeing the local chapters. *Id.* at 20 (Bylaw § 3.05).  As part of their oversight powers, the Boards of Directors are responsible "for the enforcement of any penalty against any member of the Organization if such penalty results or has the likelihood of resulting in the suspension or expulsion of such member or otherwise in the incapacity of such a member to retain his membership status." *Id.* at 22 (Bylaw § 3.05.01).  Both the Board of Trustees and the Boards of Directors have the power to suspend members, if certain conditions are met. *Id.* at 29 (Bylaw § 4.13).

Finally, the bylaws set parameters for elections and voting.  Both Trustees and Directors hold office for two-year terms and may serve a maximum of two consecutive terms in their

respective positions. *Id.* at 25 (Bylaw § 4.01). Schedule E of the bylaws sets forth Electoral Guidelines. *Id.* at 50–58. These guidelines establish a Central Electoral Committee at the continental level to oversee elections, with a Local Electoral Committee within each chapter. *Id.* at 51–52. In general, members who are in good standing and who have been members for at least six months are eligible to vote in NIDOA elections. *Id.* at 51. Elections for Trustees and Directors are held at the chapter level, then tabulated and transmitted to the Central Electoral Committee for ratification, *id.* at 53–54, before new officers are sworn in at the AGM, *id.* at 35 (Bylaw § 6.04).

Once a Board is formed, the bylaws govern the rules for its meetings and voting. At the first meeting of the Board, the Trustees or Directors "shall establish the quorum for meeting." *Id.* at 30 (Bylaw § 4.17). But in any event, "[a] two-third majority of the entire Board shall constitute a quorum for the transaction of business or of any specified item of business." *Id.* And "[a] vote of a majority[ ]of the Trustees [or Directors] present at the time of the vote, if a quorum is present at the time, shall be the act of the Board." *Id.*

2. *Registration of NIDOA-USA*

Key, who is a member of NIDOA's Maryland chapter, began serving on the NIDOA-USA Board of Directors in 2015, as its public relations officer. Dkt. 66 at 89–90 (Key); Dkt. 52-5 at 2 (Ex. P-32).[2] In 2017, Key was elected chairperson of the Board of Directors. *See* Dkt. 66 at 92–93, 97 (Key); Dkt. 59-9 at 2 (Ex. P-72). In that role, on January 13, 2019, she presided over a meeting at which the Board of Directors discussed its goals for that year. Dkt. 53-8 (Ex. D-3). According to the minutes from the meeting, Key presented more than a dozen priorities

---

[2] Exhibit P-32 was not admitted into evidence at the hearing, but the Court, acting sua sponte, admits the exhibit into evidence now.

for the board to consider, including "[r]egistration of NIDOA USA BOD in accordance with

U.S. Law which has become very important as [the organization] seek[s] to obtain grants to help

fund [its] deliverables." *Id.* at 3.

Much of the debate over the goals centered on this registration proposal. One Board

member stated that the registration was necessary for the national organization to operate

effectively and argued that the registration was permissible under the bylaws. *Id.* at 4. Another

"stressed" that a separate nonprofit registration for the USA entity was necessary for tax

purposes. *Id.* Others spoke against the proposal. *Id.* The minutes indicate that twenty board

members were present at the start of the meeting. *Id.* at 1. When the board took a vote on the

goals, "the motion passed" with nine yes votes, zero no votes, and six abstentions. *Id.* at 5. It is

unclear how many Board members left the meeting before the vote. Thereafter, NIDOA-USA

filed its articles of incorporation as a nonprofit with the D.C. city government, with Key listed as

one of four directors. Dkt. 53-9 (Ex. D-4); *see also* Dkt. 53-10 (Ex. D-5) (IRS document

assigning NIDOA-USA an Employer Identification Number).

3. *Division Within NIDOA*

The Board of Directors' decision to register the national entity without first seeking the

approval of the continental Board of Trustees set off a power struggle within NIDOA. Two days

after the Board of Directors decided to register separately from the continental organization, the

Board of Trustees held a meeting to "review and take necessary action" in response. Dkt. 52-16

at 1 (Ex. P-43). Several Trustees commented that the action by the Board of Directors was the

latest salvo in an ongoing power struggle between the Trustees and Directors and accused Key,

in particular, of disrespecting Trustees chairperson Obed Monago. *Id.* at 1–3. Samuel Adewusi,

who was a member of the Board of Trustees at that time and who is Plaintiff's counsel in this

case, argued that the registration of the country entity violated the bylaws.[3]  *Id.* at 3–4.  Key, who by virtue of her position as chairperson of the Board of Directors was also a member of the Board of Trustees, Dkt. 66 at 97 (Key), tried to defend herself, arguing that the controversial 2019 goals had been discussed previously and thus "there [was] no time that BOD [had] done anything without notice," Dkt. 52-16 at 2 (Ex. P-43).  Despite Key's objections, the Trustees then passed a motion, by a vote of ten to two, that "[b]y voting to pursue new registration, new bylaws, new legal adviser, and new tax id, the people that voted have effectively removed themselves from NIDOA."  *Id.* at 4.  The minutes from the meeting concluded that "[t]here is a need to reconstitute NIDOA-USA on an interim basis and a letter will soon follow."  *Id.*

On March 16, 2019, NIDOA legal adviser Michael Essien sent a letter to Key "and All Concerned Parties" notifying them that the Trustees, "as empowered, appointed an 'Interim Executive Board' to carry on the affairs of NIDOA-USA."  Dkt. 51-16 at 1 (Ex. P-13).  The letter warned that "[a]nyone who is not a member of that constituted Interim Executive must not hold themselves out as executives of NIDOA-USA."  *Id.* (bold omitted).  The letter went on to assert that "[t]he name, logo[,] and any moniker that is confusingly similar to that of NIDO/NIDOA are trademark-protected and belong to the overarching entity."  *Id.*  Finally, the letter directed that "all unapproved structures must cease and desist from claiming legitimacy and infringing on the trademark of NIDOA."  *Id.*

Meanwhile, the Board of Directors took disciplinary action against certain Trustees, most notably the Trustees chairperson, who also sits on the Board of Directors.  On January 18, 2019, George Nwogu, the general secretary for NIDOA-USA, sent Trustees chairperson Obed Monago

---

[3]  Key has registered no objection to Samuel Adewusi serving as counsel in a case in which he is, at least in theory, a potential witness (albeit apparently not an essential one).

a "notice of recommendation for disciplinary action" accusing him of "exhibition of repeated conduct amounting to gross violations of the bylaws, conduct detrimental to NIDOA-USA and Continental Americas, as well as totally unbecoming of a NIDOA-USA Director who holds multiple leadership positions within both NIDOA-USA and the NIDOA Continental body."  Dkt. 53-11 at 1 (Ex. D-6).  The letter demands a written apology within seventy-two hours.  *Id.* at 2. After not receiving that apology, Nwogu sent Monago a follow-up letter on February 6, 2019 notifying him that he had been "impeach[ed]" and removed from the Board of Directors.  Dkt. 53-12 at 1 (Ex. D-7).[4]  These various actions produced a schism between the Board of Directors, as initially constituted, and the Board of Trustees.

4.    *Embassy Meeting*

On April 13, 2019, the Nigerian Ambassador to the United States, Silvanus Nsofor, hosted a "peace process" at the Nigerian Embassy in Washington, D.C. to negotiate a resolution between the Trustees and the Directors.  Dkt. 53-14 at 1 (Ex. D-9).  Both sides "agreed on the need for unity" and "agreed to adhere to the out come [*sic*] of this peace process."  *Id.* at 2. Those present, including Key, representing the Board of Directors, and Monago, representing the Board of Trustees, agreed that the bylaws contained "certain ambiguities and lacuna" that were "responsible for the current leadership crises."  *Id.* at 1–2.  Ultimately, the parties agreed that until the next AGM, "the status quo ante should be maintained," including a return to the composition of the two Boards before the January 13, 2019 meeting of the Directors.  *Id.* at 2. More significantly for present purposes, the parties also recognized, "[b]ased on the over whelming [*sic*] recommendation and support for registration of National and Local chapters for

_____

[4]  Exhibit D-6 and Exhibit D-7 are hereby admitted into evidence.

administrative and operational convenience," the "imperative[]" to register country and local organizations. *Id.*

     5.    *2019 Elections and Holdover Board*

     The détente did not last.  The Continental Election Committee set the organization's biennial elections for July 31 and August 1, 2019, to be conducted online.  Dkt. 51-14 (Ex. P-11).  On May 19, 2019 the Committee sent its election guidelines out to the various chapters, with instructions for how the local Election Committees should help to coordinate the elections.  *See* Dkt. 51-13 (Ex. P-10); Dkt. 51-11 (Ex. P-8).  The incumbent Board of Directors objected to the proposed election procedures.  Dkt. 57-5 (Ex. D-39).  In a letter from Nwogu to the Trustees dated July 30, 2019, the Directors gave notice of resolutions they had passed objecting to the plan for the upcoming elections on the ground that the proposal did not comply with the bylaws.  *Id.* at 1.  As a result, the incumbent Board of Directors, as well as certain chapters and individual members loyal to that board, boycotted the elections.  Dkt. 66 at 34–36 (Nwogu).

     Despite these objections, the online election process went forward, and a new Board of Directors was elected.  Dkt. 51-14 (Ex. P-11).  Key, who had completed her two terms in office and who objected to the validity of the elections, did not participate.  *Id.*; Dkt. 66 at 62 (Nwogu).  As a result of the election, Isaac Inyang became the chairperson of the new Board of Directors.  *See* Dkt. 51-14 at 4 (Ex. P-11); Dkt. 64 at 33 (Essien); *id.* at 151 (Eleonu); Dkt. 51-22 at 5 (Ex. P-19).  In a follow-up letter dated August 8, 2019, the general secretary of the prior Board of Directors wrote to Chuks Eleonu of the Central Electoral Committee again objecting to the election results, alleging violations of the bylaws and giving no indication that it would transfer power to the newly elected Directors.  Dkt. 57-6 (Ex. D-40); *see also* Dkt. 64 at 135 (Eleonu).

The new Board of Directors, including Isaac Inyang as chairperson, was sworn in at the AGM in Houston, held September 5 to 8, 2019.  Dkt. 51-22 at 5 (Ex. P-19).

On September 5, 2019, while the new Board was being recognized at the AGM, Defendant and the rest of the holdover Board issued an "IMPORTANT ANNOUNCEMENT REGARDING NIDOA-USA BOARD'S DECISION ON THE ORGANIZATION'S FUTURE." Dkt. 53-20 at 1 (Ex. D-15).[5]  The document announced a "critical decision" by the prior Board of Directors "that culminated from more than a year of unprecedented turmoil" to "henceforth cease[] to operate under the auspices of the [Monago-led Board of Trustees] beginning September 1, 2019."  *Id.*  The NIDOA-USA Board of Directors would not participate in the AGM, "and decisions reached there will be of no consequence [to] NIDOA-USA and its chapters."  *Id.*

As such, Defendant and her holdover Board of Directors continued to operate after the 2019 elections, and thus, after that date, two separate Boards of Directors purported to represent NIDOA-USA.

6.      *Defendant's Fundraisers, Events, and Competing Election*

On September 29, 2019, the holdover board issued a press release announcing two events. Dkt. 51-18 (Ex. P-15).  The release indicated that it was "from the desk of Prof. Diuto Esiobu."  *Id.*  The first event, titled the NIDOA Entrepreneurs Summit 2019, was to be held on October 30 and 31, 2019, at a hotel in Nigeria.  *Id.* at 2.  The release sought sponsorships for the event and asked that checks be made payable to NIDOA-USA and mailed to Ndubueze Chuku. *Id.*  The second event, scheduled for November 22 and 23, 2019, was to be an AGM for NIDOA-

---

[5]  The Court admits Exhibit D-15 into evidence.

USA.  *Id.* at 3.  The release promoted the event with the tagline "IT[']S A NEW DAWN AT NIDOA USA!"  *Id.*  Key's name does not appear anywhere on the document.

At the preliminary injunction hearing, Plaintiff also proffered a Group Sales Agreement from the Marriott hotel, which was to be the site of the NIDOA-USA meeting on November 22 and 23, 2019.  Dkt. 51-19 (Ex. P-16).  The Agreement, although not signed, was to be between the hotel and "Nigerians in Diaspora Organization Americas (NIDOA)" and indicated that the organization would make installment payments in excess of $15,000.  *Id.* at 2–3.  Key was listed as the contact for NIDOA.  *Id.* at 2.  Sometime later, Key posted a flyer in a NIDOA group on WhatsApp advertising NIDOA-USA's "Annual Summit 2019," but with the location changed from the hotel to the Embassy of Nigeria in Washington, D.C.  Dkt. 52-23 (Ex. P-20).  The flyer uses a logo like NIDOA's trademarked one, but with the addition of "USA."  *Id.*  The flyer also indicates that the event will include "fundraising."  *Id.*

Afterward, Key sent out a "communique" explaining what had occurred at this conference, which the communique referred to as the "Nigerians in Diaspora Americas USA (NIDOA-USA) 2nd Annual National Summit."  Dkt. 53-30 (Ex. D-25).  Under the heading "NIDOA-USA Executive Leadership," the document stated that "[t]he summit approved a motion to maintain the status quo with respect to the current NIDOA-USA Executive Leadership until new elections are conducted before the 2020 NIDOA-USA Annual Summit."  *Id.* at 3.  Further, "[t]he summit also reaffirmed the August 23, 2019 NIDOA-USA Board Resolution by approving and recognizing the current NIDOA-USA Executive Board headed by Chairman Patience Key as the authentic NIDOA-USA Executive Leadership Board."  *Id.*

On June 12, 2020, Key issued a press release for Nigeria's Democracy Day.  Dkt. 51-26 at 1 (Ex. P-23).  In the press release, which again used the NIDOA logo with "USA" added, she

was identified as the chairperson of NIDOA-USA.  The release "call[ed] for fundamental structural and ethical reforms to repurpose and rescue our nation from further slide into the abyss."  *Id.* at 2.  Key's board produced a flyer, again using the same logo, promoting a virtual conference on Nigerian democracy, to be held via videoconference on July 18, 2020, Dkt. 51-27 (Ex. P-24), and a white paper with policy proposals for the "restructuring of the Nigerian state," signed by NIDOA-USA public relations officer Yinka Tella.  Dkt. 51-29 (Ex. P-26).

In a NIDOA WhatsApp Group, Joe Ogbechie posted a "communique" titled "BOD Elections – 2020," indicating that the holdover Board of Directors was planning to host its own elections at which its successors would be chosen, again not recognizing the new Board of Directors elected in 2019.  Dkt. 51-28 (Ex. P-25).  In what appears to be the document posted in the WhatsApp Group, *see* Dkt. 64 at 211–12 (Inyang), Ogbechie announced guidelines for the upcoming elections and named an election committee, Dkt. 52-12 (Ex. P-39).  The document indicated that the nomination period for open positions would run from September 21, 2020 through October 13, 2020, with the election to be held "no later than" October 20, 2020.  *Id.* at 2. Key's name did not appear in this document.

On October 7, 2020, Key and Yinka Tella, using the same logo, sent out an invitation to a virtual National Summit/Annual General Meeting of NIDOA-USA to be held November 13 to 15, 2020, with a theme of "Formulating Post COVID-19 Rebuilding Strategies for Nigeria." Dkt. 55-9 (Ex. P-64).  The invitation also solicited sponsorships in the form of advertisements in the event's electronic souvenir program and listed rates for ads of various sizes.  *Id.*  On October 20, 2020, Key issued a press release, again using the same logo, condemning the shooting of protesters by the Nigerian military.  Dkt. 55-10 (Ex. P-65).

7.      *Alleged Confusion and Plaintiff's Efforts to Protect Its Trademarks*

At the hearing, Plaintiff presented evidence that having two competing Boards of Directors for NIDOA-USA caused some confusion and some loss of goodwill and donations for the continental organization and for the Board of Directors elected in 2019.  A portion of this evidence related to specific examples in which members or donors confused the two boards, while other testimony alleged (without specific proof) more generalized confusion on the part of members, which thwarted efforts by the Board elected in 2019 to govern the organization.

In one example, a member messaged Obed Monago through WhatsApp to report a $100 donation for a COVID-19 fundraiser, but it turned out that the money had accidentally been sent to Key's Board of Directors, when the member intended to send the money to the Board of Directors elected in 2019.  Dkt. 52-30 (Ex. P-56A); Dkt. 52-31 (Ex. P-56B); Dkt. 65 at 164–65 (Monago).  In another WhatsApp message, a different NIDOA member, Madam Lola, wrote to Monago, observing that a press release from Key was "very[,] very confusing" and complaining that the "faction" within NIDOA "sends a wrong signal to the outside world."  Dkt. 55-11 (Ex. P-66); Dkt. 65 at 168–69 (Monago).

Testimony at the hearing recounted additional, albeit more generalized, instances of confusion or lost fundraising opportunities.  Isaac Inyang, the chairperson of the Board of Directors elected in 2019, testified that his COVID-19 fundraising efforts were hampered by confusion resulting from Key's competing COVID-19 fundraiser.  Dkt. 64 at 209 (Inyang).  Inyang testified that members told him "they are very confused" by Key's actions and that she "is bringing the image of NIDO down."  *Id.* at 214 (Inyang).  Apollos Nwauwa, a former Trustee, testified that division within NIDOA and Key's continued use of NIDOA's trademarks has "badly damaged" NIDOA's "brand" and "shaken" the "spirit of so many members."  Dkt. 65

14

at 99 (Nwauwa).  Chuks Eleonu, a founding member of NIDOA and a member of the Central

Electoral Committee, testified that although "Isaac Inyang[] is the duly elected chairman of the

USA board," Key has "continued to promote herself as also the USA [NIDOA] board."  Dkt. 64

at 157 (Eleonu).  "When she posts and people are reading from her, and then Mr. Inyang posts

and people are reading from him," the testimony continued, "there's a question of legitimacy and

who is the rightful chair. And that's where that confusion is coming from."  *Id.*  Eleonu asserted

that his testimony about confusion was not "an assumption" but was based on his interactions

with confused "media personalities."  *Id.* at 158 (Eleonu).  He testified that as recently as sixty

days before the hearing, a reporter, after receiving an event notification from Key, approached

him "trying to validate if NIDO is still having two different directors."  *Id.*  Eleonu went on to

testify, however, that "the confusion is not internal," because the membership of NIDOA is

aware of the situation with the dueling Boards of Directors.  *Id.* at 160 (Eleonu).

Plaintiff has issued several notices to protect its trademarks and clear up confusion.  In

addition to the Mach 2019 cease-and-desist letter mentioned above, Dkt. 51-16 at 1 (Ex. P-13),

NIDOA issued a second cease-and-desist letter on September 7, 2019, during the AGM and

following the elections, Dkt. 51-17 (Ex. P-14).  The letter, addressed to Key, thanked her for her

"contributions and services to the organization" and purported to "accept[] [her] resignation from

the organization."  *Id.* at 2.  The letter "formally and officially request[ed]" that Key "return all

NIDOA assets and materials in [her] possession and under [her] control," including financial

documents.  *Id.*  And the letter again demanded that Key "cease and desist from adapting and

using in any form, shape[,] or manner the brand name, image[,] or logo" of NIDOA "or mak[ing]

any effort to continue to infringe on the Trademark of the organization going forward."  *Id.*

(emphasis omitted).  After commencing this litigation, Plaintiff also issued two public

disclaimers announcing that Key was no longer associated with the organization.  Dkt. 51-24 (Ex. P-21); Dkt. 51-25 (Ex. P-22).  In the first, dated November 5, 2019, NIDOA legal adviser Michael Essien wrote to Ambassador Nsofor, asserting that Key "does not currently represent any organ or subsidiary of NIDO Americas in any official capacity."  Dkt. 51-24 (Ex. P-21).  In the second, dated April 22, 2020, Trustees chairperson Monago issues a press release announcing: "The general public is hereby notified that NIDO Americas does not in any way, shape[,] or form authorize, consent to, or sanction the COVID-19 fundraising by [Key] and her associates."  Dkt. 51-25 (Ex. P-22).  As such, "any member of the public donating funds to [Key] and her associates does so at their own peril."  *Id.*

8.    *Subsequent Events*

After Plaintiff filed its motion for preliminary injunction, Key's holdover Board of Directors held an election to select their successors.  Dkt. 66 at 122 (Key).  Key testified that new officers would take over the separate NIDOA-USA organization the week of December 19, 2020.  *Id.*  Key further testified that the new board has "roughly 23" members, including a new chairperson, and that she is "not a member of the newly elected board."  *Id.* at 122–23 (Key).  She "didn't even run for any of the elections."  *Id.* at 123 (Key).

**B.    Procedural Background**

Plaintiff filed this lawsuit on October 9, 2019.  Dkt. 1.  Plaintiff alleges trademark infringement and false advertising, *id.* at 7–8 (Compl. ¶¶ 25–37), and requests damages as well as declaratory and injunctive relief, *id.* at 8–9 (Compl. ¶¶ 38–43).  Plaintiff then filed three successive motions for default judgment, Dkt. 7; Dkt. 9; Dkt. 14, all of which were denied, *see* Minute Order (Dec. 20, 2019); Minute Order (Jan. 28, 2020); Minute Order (Feb. 11, 2020).  Key then filed a motion to dismiss, Dkt. 15, and Plaintiff filed a motion for summary judgment,

Dkt. 16.  The Court denied both motions without prejudice as premature and referred the case to mediation, Minute Entry (March 11, 2020), which was unsuccessful, Dkt. 33.

On August 24, 2020, Plaintiff filed its motion for preliminary injunction.  Dkt. 39.  An entity representing that it is NIDOA-USA, apparently acting at the direction of the holdover Board of Directors, then filed a motion to intervene as a defendant, Dkt. 41, which Plaintiff opposed, Dkt. 42.  In light of these developments, the Court scheduled an evidentiary hearing on the motion for preliminary injunction by videoconference, which ran for four days.  *See* Minute Entry (Oct. 15, 2020); Minute Entry (Oct. 27, 2020); Minute Entry (Nov. 12, 2020); Minute Entry (Nov. 13, 2020).  The parties then submitted proposed findings of fact and conclusions of law.  Dkt. 68; Dkt. 69.  The entity purporting to be NIDOA-USA then withdrew its motion to intervene.  Dkt. 70.  Finally, Plaintiff filed a rebuttal to Key's proposed findings of fact and conclusions of law.  Dkt. 71.  Plaintiff's motion for preliminary injunction is now ripe for decision.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), but "only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  To secure a preliminary injunction, a plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  The first factor is the "most important."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).

Before the Supreme Court's decision in *Winter*, the D.C. Circuit applied a "sliding-scale" approach to the preliminary injunction analysis under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). Since *Winter*, however, the court of appeals has hinted on several occasions "'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Id.* at 393 (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring)); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (observing that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned"). But it has repeatedly declined to decide the issue. *See, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 746 F.3d 1065, 1074 (D.C. Cir. 2014), *reinstated in relevant part by* 760 F.3d 18 (D.C. Cir. 2014) (en banc); *Sherley*, 644 F.3d at 393.

## III. ANALYSIS

Before turning to the application of the four preliminary injunction factors, the Court must address Key's argument that Plaintiff's claim for injunctive relief against her is moot. Plaintiff's motion seeks an injunction preventing Key "from infringing on NIDOA trademarks and engaging in false advertisement related to the Plaintiff's trademarks and goodwill." Dkt. 39 at 1. The motion contends that Key "has infringed and continues to infringe upon NIDOA's Trademarks." *Id.* at 4. Plaintiff contends that "[e]fforts to address the infringing actions of the Defendant Key proved fruitless and her continuing damaging actions support the decision that an injunction is the only avenue to mitigate the damage." *Id.*

In her most recent filing, Key contends that Plaintiff's claim for injunctive relief is now moot. Dkt. 69 at 10–11. As noted above, she testified at the hearing that the holdover Board had

18

already conducted elections and that new officers would take over the separate NIDOA-USA organization the week of December 19, 2020.  Dkt. 66 at 122–23 (Key).  Key testified that she is "not a member of the newly elected board."  *Id.* at 123 (Key).  Based on that testimony, the Court asked, "[I]f Ms. Key is no longer an officer, and this is a motion for an injunction and not for damages, is there any prospect that she's going to be doing anything in the future that would present the risk of injury that the plaintiff is pursuing?"  *Id.* at 123–24.  Key now argues the claim for injunctive relief is, in fact, moot because she "is no longer in leadership in NIDOA[-]USA."  Dkt. 69 at 10.

As a general principle, a defendant's "voluntary cessation" of allegedly illegal conduct does not deprive a court of jurisdiction to decide a case.  *Cierco v. Mnuchin*, 857 F.3d 407, 414 (D.C. Cir. 2017).  But "there is an important exception to this important exception" to the mootness doctrine.  *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 918 F.3d 151, 157 (D.C. Cir. 2019) (quotation omitted).  A claim for injunctive relief may nevertheless become moot based on the defendant's voluntary cessation of the challenged activity if the defendant carries the "heavy burden" of showing that "subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 189 (2000) (quotation omitted).

Although absolute clarity is a "stringent" standard, *id.*, the Court is satisfied that Key has demonstrated that her challenged conduct is not reasonably likely to recur, at least not while this case is pending final resolution, which is the relevant timeframe for a preliminary injunction.  Plaintiff named only a single individual (in her personal capacity) as a defendant in this case, *see* Dkt. 1 at 1 (suing Key as an "individual and resident of Maryland"), but Key did not engage in

the challenged activities alone in her personal capacity.  Rather, the challenged actions were

those of the holdover Board of Directors, of which Key was the leader.  Indeed, many of the

documents that Plaintiff claims infringed its trademark do not bear Key's name at all or reference

Key among other Directors.  Because Key's actions were objectionable to Plaintiff only in the

context of her role on the holdover Board of Directors, there is no basis to find that she will

continue to infringe Plaintiff's trademarks during the pendency of this action, now that she is no

longer a member of that board.

      Plaintiff makes two arguments in response.  First, Plaintiff cites an interview that Key

gave to an online news source for the proposition that she "intends to continue her role in setting

policy directions for the illegal NIDOA[-]USA."  Dkt. 71 at 10–11.  But the interview that

Plaintiff cites does not support this argument.  *See* Ademola Akinbola, *We Have Put NIDO*

*Americas USA on a Sound Footing, But There Is More Work to Be Done – Key*, The Podium

Media (Dec. 25, 2020), https://thepodiummedia.com/we-have-put-nido-americas-usa-on-a-

sound-footing-but-there-is-more-work-to-be-done-key/25/12/2020.  In the interview, Key merely

says that she "will continue to support and play my part in my local chapter in the state of

Maryland and answer the call when needed at the national level."  *Id.*  She also says that she

would "support where and when I am needed," before going on to describe plans to seek higher

education and write two books.  *Id.*  The fact of Defendant's continued membership in her local

chapter is, of course, insufficient to support an inference that she may continue to use Plaintiff's

trademarks.  More importantly, there is no indication in the article that she will continue to have

any role with the Board of Directors.

      Under NIDOA's bylaws, a Director is barred from serving more than two consecutive

terms in office.  Dkt. 51-10 at 25 (Bylaw § 4.01.2).  It is thus conceivable that Key could seek a

leadership position within NIDOA-USA again in a couple of years and that perhaps, then, the threat that she may use Plaintiff's trademarks would be revived. But the motion pending before the Court seeks only a preliminary injunction. As the D.C. Circuit has explained, "'[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). The Court is satisfied that Key, by relinquishing her position on the Board of Directors, has carried her burden of showing that "the allegedly wrongful behavior could not reasonably be expected to recur" between now and the time when a trial on the merits may be held. *See Laidlaw*, 528 U.S. at 189 (quotation omitted).

Second, Plaintiff argues that Key "merely pass[ed] the baton of the illegally registered corporation to her assignees and successors in interest," Dkt. 71 at 11, and, similarly, that she "passed on the mantle of the illegal corporate registration to her assignees and successors who will ultimately continue to infringe upon NIDOA's trademarks," *id.* at 10. Plaintiff thus implies, without any citation to legal authority, that its claim for injunctive relief is not moot because the Court could enter an injunction against not only Key but also her "assignees and successors" on the allegedly *ultra vires* Board of Directors. As Plaintiff suggests, the Court has the equitable power to enjoin third parties. It is, of course, black-letter law that "a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945). This rule is necessary to ensure that "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Id.* This principle is embodied in Rule 65, which permits the Court to

enjoin "the parties," as well as "the parties' officers, agents, servants, employees, and attorneys" or "other persons who are in active concert or participation with" them, so long as anyone bound receives "actual notice" of the injunction "by personal service or otherwise." Fed. R. Civ. P. 65(d)(2). It is thus commonplace in cases involving corporations, for instance, to enjoin successors in interest.

But the Court's equitable power to enjoin certain third parties is not an exception to the mootness doctrine. In the typical case, a Court enters an injunction against a defendant and then extends that order to the defendant's agents or successors in interest to avoid circumvention of the Court's decree. A successful claim against *a party to the case* is thus an essential prerequisite. Here, however, Plaintiff is essentially asking the Court to enjoin third parties even though the claim for a preliminary injunction against Key, the only defendant named in the case, is moot. If there is no basis directly to enjoin Key as the named defendant, then there can be no basis indirectly to enjoin her unnamed agents and assignees. Any rule to the contrary would make a mockery of due process. Nor has Plaintiff shown that these "assignees and successors" are in privity with Key or are acting as her agents. Plaintiff sued Key in her individual capacity, and nothing in the record indicates that Key has any control over her successors on the Board. It is thus unsurprising that Plaintiff provides no legal basis on which the Court could enjoin Key's successors on the Board of Directors.

Plaintiff decided whom to sue in this lawsuit, and it named only Key. If Plaintiff had wanted to file suit against the entire holdover Board of Directors, it was free to do so. Or, when the entity purporting to be NIDOA-USA (and representing the holdover Board) sought to intervene in this action as a defendant, Dkt. 41, Plaintiff could have consented in that motion, rather than opposing it, Dkt. 42. Even after the hearing, Plaintiff could have opposed the

withdrawal of NIDOA-USA's motion to intervene.  Even now, Plaintiff could seek to add the holdover Board of Directors as a party to this litigation under Rule 19 or 20 of the Federal Rules of Civil Procedure.  But Plaintiff did none of those things.  Instead, Plaintiff filed suit against only Key, and Key is no longer in a position in which there is a discernible prospect that she will infringe on Plaintiff's trademarks.  There is thus nothing that the Court could reasonably enjoin her from doing.

The Court recognizes, however, that the above analysis slices the mootness doctrine rather thin.  The Court holds only that Plaintiff's claim for a preliminary injunction is moot, while reserving judgment as to both Plaintiff's damages claim and its claims for a declaratory judgment or permanent injunctive relief.  But even if it were incorrect for the Court to conduct a mootness inquiry directed at only the request for preliminary relief, the Court would reach precisely the same result on the ground that Plaintiff has not shown a likelihood that it will suffer irreparable harm in the absence of a preliminary injunction.

"[A] showing that irreparable injury is 'likely' is the *sine qua non* for obtaining a preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." *Jubilant DraxImage Inc. v. U.S. Int'l Trade Comm'n*, No. 19-cv-1494, 2020 WL 5816247, at *12 (D.D.C. Sept. 30, 2020) (quoting *Achagzai v. Broad. Bd. of Governors*, No. 14-cv-768, 2016 WL 471274, at *3 (D.D.C. Feb. 8, 2016)).  "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Gospel Churches*, 454 F.3d at 297. The threat of irreparable injury must be "both certain and great; it must be actual and not theoretical." *Id.* (quotation omitted).

Plaintiff makes two arguments with respect to irreparable harm.  First, the organization argues that "[i]rreparable injury may be presumed in an unfair competition action."  Dkt. 39 at 10.  Second, Plaintiff argues that "Key's infringing activities and conduct[] [have] continued without abatement," Dkt. 68 at 7, and that her "unauthorized and willful use of the marks apparently causes confusion to the public generally and the Nigerian community in particular," *id.* at 13.

Plaintiff's contention that irreparable injury may be presumed in an intellectual property case is outdated.  Prior to the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), some federal courts applied a rule that in patent cases, so long as the plaintiff showed a valid patent and infringement of that patent with respect to their likelihood of success on the merits, then irreparable harm could be presumed.  *See MercExchange, L.L.C. v. eBay, Inc.*, 401 F.3d 1323, 1338 (Fed. Cir. 2005) (describing the lower standard for preliminary injunctions in patent cases as a general rule), *rev'd*, 547 U.S. 388.  But in *eBay*, the Supreme Court held that plaintiffs in patent cases needed to satisfy the traditional four-part test for injunctive relief, including a likelihood of irreparable injury.  547 U.S. at 391–93.  Because the same reasoning applies with equal force to claims of trademark infringement under the Lanham Act, the courts of appeals have extended the *eBay* rule to eliminate the presumption of irreparable harm in the trademark context as well.  *See Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 213–14 (3d Cir. 2014); *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013); *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006).  As such, Plaintiff must carry its burden of showing a likelihood of irreparable harm without the assistance of any presumption.

Regardless of whether Plaintiff may have a strong claim on the merits, the Court concludes that the organization has not shown a likelihood of irreparable harm that warrants the extraordinary remedy of a preliminary injunction.  An injunction is a prospective form of relief, designed to prevent future injury.  It goes without saying that the Court cannot enjoin Key from using Plaintiff's trademarks in the past.  The question then is whether Plaintiff has demonstrated a likelihood of ongoing or future irreparable harm.  They have not, because Key has left the holdover Board of Directors and is unlikely to use Plaintiff's trademarks going forward. Ongoing confusion allegedly caused by Key's past acts is insufficient to support injunctive relief, in the absence of some likelihood that Key will take similar actions again in the future.  A preliminary injunction is thus unwarranted at this stage in the case.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff's motion for preliminary injunction, Dkt. 39, is **DENIED**.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS

Date: March 3, 2021